## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| WHIRLPOOL CORPORATION <br> 2000 N M-63, MD 2200 <br> Benton Harbor, MI  49022 | ) <br> ) <br> ) <br> ) | CIVIL ACTION NO. <br><br> JUDGE |
| Plaintiff, | ) <br> ) | |
| vs. | ) <br> ) | |
| CORE SYSTEMS LLC <br> 787 Renaissance Parkway <br> Painesville, OH 44077 | ) <br> ) <br> ) <br> ) <br> ) | **COMPLAINT** |
| Defendant. | ) | |

Plaintiff Whirlpool Corporation ("Whirlpool") hereby states as follows for its complaint against Defendant Core Systems, LLC ("Core"):

### INTRODUCTION

Whirlpool brings this case to recover possession of its tooling equipment, which is being wrongfully withheld by Core in a clear and express breach of the parties' agreement.  Core has possession of Whirlpool's tooling equipment solely in the capacity of a bailee.  As explicitly acknowledged in the agreement between Whirlpool and Core, Whirlpool is the owner of the tooling, and has the clear and unequivocal right to immediate possession of the tooling on demand.  Core's refusal to relinquish possession of the tooling constitutes a clear breach of the parties' agreement, as well as unlawful conversion of Whirlpool's property.  As a result, Whirlpool seeks an immediate order prohibiting Core from continuing to prevent Whirlpool from recovering possession of its tooling.  Whirlpool also seeks recovery of the substantial damages, costs, and expenses proximately caused by Core's wrongful actions.

## PARTIES AND JURISDICTION

1. Plaintiff Whirlpool Corporation is a Delaware corporation with its principal place of business located in Benton Harbor, Michigan.

2. Defendant Core Systems, LLC is an Ohio limited liability company with its principal place of business located in Painesville, Ohio.

3. This Court has jurisdiction under 28 U.S.C. § 1332.

4. Venue is proper in this Court under 28 U.S.C. § 1391.

## GENERAL ALLEGATIONS

5. Whirlpool is a leading manufacturer and seller of a wide range of home appliances.

6. Core manufactures and supplies over 170 separate production parts (the "Component Parts") to Whirlpool.

7. Whirlpool incorporates the Component Parts into thousands of products manufactured at several Whirlpool facilities in Ohio, including manufacturing plants in Findlay, Clyde, Marion, and Greenville.

8. Core uses certain tooling and related equipment and accessories owned by Whirlpool (collectively, the "Whirlpool Tooling") to manufacture the Component Parts. A true and accurate listing of the Whirlpool Tooling at issue in this action is attached as **Exhibit A.**

9. The Whirlpool Tooling is unique, custom equipment that was designed, engineered, and manufactured for, and is essential to, the production of the Component Parts.

10. Whirlpool has made the decision to resource production of the Component Parts from Core to an alternate supplier.

11. Whirlpool requires immediate possession of the Whirlpool Tooling in order to resource production of the Component Parts to a substitute supplier to avoid costly production disruptions at Whirlpool manufacturing facilities.

12. Pursuant to a written agreement between the parties, "[i]n the event Whirlpool elects to resource production of the Whirlpool parts, Core agrees to allow Whirlpool immediate and full access to Core's facilities to load and remove Whirlpool's tooling." *See* Performance Improvement Plan Agreement (the "PIP Agreement") at 3.  A true and accurate copy of the PIP Agreement is attached as **Exhibit B**.

13. Whirlpool has requested access to Core's facilities to load and remove the Whirlpool tooling, but Core has refused.

14. Core's refusal to promptly return the Whirlpool Tooling upon Whirlpool's request constitutes a clear and express breach of the PIP Agreement.

15. Core's wrongful refusal to release the Whirlpool Tooling to Whirlpool violates Whirlpool's rights to ownership and immediate possession of the Whirlpool Tooling.

### STATEMENT OF FACTS

16. Whirlpool and Core have entered into Tooling Bailment Agreements (the "Bailment Agreements"). A true and accurate copy of the most recent Bailment Agreement is attached as **Exhibit C**.

17. The Bailment Agreements expressly provide that Core has possession of the Whirlpool Tooling strictly in the capacity "as Whirlpool's bailee at will." (Ex. C, ¶ 2.)

18. As bailor, and pursuant to the Bailment Agreements, Whirlpool possesses an unconditional and exclusive ownership interest in all the Whirlpool Tooling and has the right to immediate possession of the Whirlpool Tooling.

19. The Bailment Agreement expressly provides that "Whirlpool owns the Whirlpool Tooling free and clear of any claims or liens," and that Core "will not sell, pledge, encumber, place or allow a lien to be placed on, or exercise ownership rights over, the Whirlpool Tooling." (Ex. C, ¶ 2.)

20. The Bailment Agreement further provides that upon Whirlpool's request, Core "shall immediately return the Whirlpool Tooling to Whirlpool or deliver the Whirlpool Tooling as Whirlpool may direct," and that Core "will not use Whirlpool Tooling to offset any claim [it has] against Whirlpool or any third party." (*Id.*)

21. The Bailment Agreement further provides that Core "agrees that ... Whirlpool will have no adequate remedy at law if [it] fails to give Whirlpool immediate possession of the Whirlpool Tooling because the Whirlpool Tooling is unique." (*Id.*)

22. Whirlpool's orders for Component Parts from Core are made solely on the basis of a blanket purchase order, subject to Whirlpool's standard terms of purchase, followed by individual releases specifying quantities for individual shipments. True and accurate copies of the most recent blanket purchase order, a representative release, and the applicable Whirlpool terms of purchase are attached as **Exhibit D**.

23. Since July 2012, Core has failed on numerous occasions to complete timely delivery of Component Parts as required under the terms of the releases, resulting in disruption to Whirlpool's operations.

24. During one ten-week period, Core failed to meet its delivery deadlines nine separate times, including one instance in which Whirlpool had to shut down an entire line and send workers home, at considerable expense to Whirlpool.

25. Core's inability to meet its delivery deadlines was exacerbated by Core's failure to notify Whirlpool in advance that it would not meet the deadlines, thus preventing Whirlpool from being able mitigate disruptions to its operations.

26. In addition to its poor delivery performance, Core has also had extensive quality problems, repeatedly delivering nonconforming goods to Whirlpool.

27. Since July 2012, Core's shipments of Component Parts to Whirlpool have included a high number of defective units, which Whirlpool has had to reject. These defective parts have caused Whirlpool to incur additional unplanned expenses in inspecting parts and in processing, returning, and billing for rejected parts.

28. Throughout 2012, Whirlpool repeatedly attempted to work with Core's management and personnel to help them improve their quality and delivery performance, including numerous on-site visits and extended periods during which Whirlpool personnel advised on Core's manufacturing processes, all at considerable expense to Whirlpool.

29. In response, Core's management personnel demonstrated an unwillingness to implement the necessary process improvements and to dedicate sufficient resources to address Core's quality and delivery deficiencies, causing Whirlpool to incur unsustainable costs in order to mitigate the damages suffered as a result of Core's inability to perform.

30. In recognition of Core's performance deficiencies, Whirlpool began transitioning supply of some of the Component Parts from Core to other suppliers.

31. On December 14, 2012, Whirlpool representatives met with Core's management at Whirlpool's offices in St. Joseph, Michigan, to discuss Core's serious deficiencies and failures to comply with its obligations as a supplier to Whirlpool. During that meeting, Whirlpool and Core discussed implementation of a mandatory Performance Improvement Plan ("PIP") with agreed-

upon metrics for improvement of Core's performance in the areas of quality, delivery, competitiveness, and finances, along with specific deadlines for accomplishing those metrics. Whirlpool also provided to Core at that time a written summary of Core's performance deficiencies.

32. Subsequent discussions and negotiations with Core led to the execution of a written Performance Improvement Plan Agreement (the "PIP Agreement"), which the parties signed January 11, 2013.

33. In the PIP Agreement, Core expressly acknowledged its numerous performance deficiencies, which had "led to plant shutdowns, production disruptions, and launch and service delays." (Ex. B, PIP Agreement at 1.) Core also expressly acknowledged that its unstable financial condition "places production of Whirlpool parts at risk" and "has resulted in production disruptions and plant schedule changes." (*Id*.)

34. Accordingly, in the PIP Agreement Core agreed "to immediately adopt process improvements and financial controls" to achieve certain specified metrics and milestones for improvement "without material assistance from Whirlpool." (*Id*.) And the first step in this process was the requirement that Core deliver to Whirlpool by January 11, 2013, a written plan "describing specifically the process improvements and financial controls to be implemented that addresses the required metrics . . . and demonstrates Core's ability to achieve the plan." (*Id*.) The list of specified metrics and milestones is on the second page of the PIP Agreement. (*Id*. at 2.)

35. The PIP Agreement includes the following events, among others, as events of default triggering Whirlpool's right to "take any action in its sole discretion," including "resourcing Whirlpool's business" (*id*. at 3):

> i) Core at any time does not meet the performance improvement and other obligations of this Agreement, or Core's performance otherwise fails to meet Whirlpool's requirements;
>
> ii) Core's credit facilities expire or are terminated, or Core's lender otherwise stops lending to Core;
>
> \*\*\*
>
> iv) Core suffers any adverse financial condition that, in Whirlpool's sole judgment, puts at risk the production of Whirlpool parts.

(*Id.*)

36. In the PIP Agreement, Core expressly acknowledged "that Core has possession of Whirlpool tools solely as bailee under [the] Tooling Bailment Agreements," and that "[i]n the event Whirlpool elects to resource production of the Whirlpool parts, Core agrees to allow Whirlpool immediate and full access to Core's facilities to load and remove Whirlpool's tooling." (*Id.*)

37. Core further acknowledged and agreed in the PIP Agreement that:

> i) Whirlpool will sustain irreparable harm to Whirlpool's business relationships, goodwill, and reputation if Core fails to immediately release the Whirlpool tooling;
>
> ii) Whirlpool is entitled to injunctive relief and specific performance to enforce Whirlpool's right to immediate possession of the Whirlpool tooling without posting a bond or proving any damages to Whirlpool or the Whirlpool tooling;
>
> iii) Core will not demand, and waives any right to demand, whether by way of complaint, answer, objection, or otherwise, that Whirlpool post a bond or prove damages of any kind or amount to Whirlpool or the Whirlpool Tooling; and
>
> iv) in the event a voluntary or involuntary petition for bankruptcy is filed for Core, Whirlpool will be entitled to relief from the automatic stay and Core waives the benefits of such automatic stay and agrees to raise no objection to such relief.

(*Id.*)

38. On January 21, 2013, just ten days after Core signed the PIP Agreement, Core disclosed that it currently owes over $1.3 million, past due, to numerous raw-material suppliers and other vendors, all of whom are necessary for production of Whirlpool parts. Core further disclosed that it had only $11,000 in cash on hand and no immediate prospect of any further financing from its lender or another lending source. Core revealed that $450,000 of this total was owed to six critical suppliers, and that production of the Core-supplied Component Parts would begin shutting down Thursday, January 24, 2013, if at least $250,000 was not immediately paid to two suppliers: Advantage Sintered Metals and Eastern Sintered.

39. Core's adverse financial condition as disclosed on January 21, 2013, puts at risk the production of Whirlpool parts and constitutes a default under the PIP Agreement.

40. Core has acknowledged that Core's financial condition as revealed on January 21, 2013, has rendered it in default of the PIP Agreement.

41. In response to its adverse financial condition and defaults, Core has requested that Whirlpool provide up to $900,000 in revolving financing to Core to enable it to meet its current obligations.

42. Core has demanded that Whirlpool pay at least $250,000 or else Core will immediately stop supplying Component Parts.

43. Whirlpool rejected Core's demands and reiterated that it would continue to rely on the terms of the PIP Agreement.

44. In light of Core's history of performance deficiencies and its recent actions and defaults of the PIP Agreement, Whirlpool has made the necessary decision to resource production of the Component Parts from Core to an alternate supplier and remove the Whirlpool Tooling from Core.

45. Core refuses to return the Whirlpool Tooling to Whirlpool.

46. Core's refusal to promptly return the Whirlpool Tooling upon Whirlpool's request constitutes a default under the PIP Agreement.

47. Core's refusal to promptly return the Whirlpool Tooling to Whirlpool is wrongful and contrary to Whirlpool's ownership and right to immediate possession of the Whirlpool Tooling.

48. The PIP Agreement provides that in response to Core's refusal to return possession of the Whirlpool Tooling, Whirlpool may seek immediate relief in a court action to enforce its ownership interest. (Ex. B at 3.)

49. Whirlpool has incurred and will continue to incur substantial damages relating to Core's refusal to turn over the Whirlpool Tooling to Whirlpool, including damages and losses resulting from the disruption of Whirlpool's production facilities. These damages include, but are not limited to, costs paid to alternative suppliers, administrative costs, freight costs and other damages.

## COUNT I
## SPECIFIC PERFORMANCE (PIP AGREEMENT)

50. Whirlpool incorporates by reference the allegations in all previous paragraphs.

51. Core and Whirlpool are parties to certain contractual agreements, including, *inter alia,* the PIP Agreement.

52. Under the PIP Agreement, Core has a duty to permit Whirlpool immediate and full access to Core's facilities to load and remove the Whirlpool Tooling. The PIP Agreement further expressly provides that Whirlpool is entitled to injunctive relief and specific performance to enforce its right to immediate possession of the Whirlpool Tooling without posting a bond or proving any damages to Whirlpool or the Whirlpool Tooling.

53. Whirlpool has demanded that it be allowed immediate and full access to Core's facilities to load and remove the Whirlpool Tooling.

54. Core has wrongfully refused to allow Whirlpool immediate and full access to Core's facilities to load and remove the Whirlpool Tooling.

55. Unless possession of the Whirlpool Tooling is immediately returned and Whirlpool is allowed immediate and full access to Core's facilities to load and remove the Whirlpool Tooling, Whirlpool will suffer irreparable harm.

56. Whirlpool is entitled to specific performance of Core's contractual obligations, including allowing Whirlpool immediate and full access to Core's facilities to load and remove the Whirlpool Tooling.

## COUNT II
## BREACH OF CONTRACT (PIP AGREEMENT)

57. Whirlpool incorporates by reference the allegations in all previous paragraphs.

58. Whirlpool and Core entered into the PIP Agreement, which expressly provides, among other things, (1) that Core has possession of the Whirlpool Tooling solely as bailee; (2) that in the event Whirlpool elects to resource production of the Component Parts to another supplier Core must allow Whirlpool immediate and full access to Core's facilities to load and remove the Whirlpool Tooling; (3) that it is an event of default for Core to suffer any adverse financial condition that, in Whirlpool's sole judgment, puts at risk the production of Whirlpool products; and (4) that Whirlpool is entitled to injunctive relief and specific performance to enforce Whirlpool's right to immediate possession of the Whirlpool Tooling without posting a bond or proving any damages to Whirlpool or the Whirlpool Tooling.

59. Whirlpool has fulfilled all its contractual obligations to Core.

60. Core has breached the PIP Agreement by, among other things, refusing to allow Whirlpool immediate and full access to Core's facilities to load and remove the Whirlpool Tooling.

61. Whirlpool has suffered damages arising out of Core's breach of contract in an amount to be determined at trial.

## COUNT III
## TURNOVER OF BAILED PROPERTY

62. Whirlpool incorporates by reference the allegations in all previous paragraphs.

63. Core has possession of the Whirlpool Tooling solely as bailee and has no other right, title or interest in the Whirlpool Tooling.

64. As bailor, and pursuant to the Bailment Agreements, Whirlpool has the sole right, title, and interest in the Whirlpool Tooling and is entitled to immediate possession of the Whirlpool Tooling.

65. Whirlpool properly demanded the return of the Whirlpool Tooling and, despite those demands, Core has refused to relinquish possession of the Whirlpool Tooling to Whirlpool.

66. Whirlpool will suffer immediate and irreparable injury if Core continues to unlawfully detain the Whirlpool Tooling.

## COUNT IV
## BREACH OF CONTRACT (BAILMENT AGREEMENTS)

67. Whirlpool incorporates by reference the allegations in all previous paragraphs.

68. Whirlpool and Core entered into the Bailment Agreements, which expressly provide, among other things, (1) that Whirlpool owns the Whirlpool Tooling free and clear of any claims or liens; (2) that Core must promptly return it to Whirlpool upon request; and (3) that Core may not use the Whirlpool Tooling to offset any claim it has against Whirlpool.

69. Whirlpool has fulfilled all its contractual obligations to Core.

70. Core has breached the Bailment Agreements by, among other things, refusing to promptly return the Whirlpool Tooling to Whirlpool upon its request.

71. Whirlpool has suffered damages arising out of Core's breach of contract in an amount to be determined at trial.

## COUNT V
## SPECIFIC PERFORMANCE (BAILMENT AGREEMENTS)

72. Whirlpool incorporates by reference the allegations in all previous paragraphs.

73. Core and Whirlpool are parties to certain contractual agreements, including, *inter alia,* the Bailment Agreements.

74. Under the Bailment Agreements, Core has a duty to return any and all Whirlpool Tooling upon Whirlpool's request.

75. Whirlpool has properly demanded the return of the Whirlpool Tooling.

76. Core has wrongfully refused to return the Whirlpool Tooling, thereby breaching its contractual obligations to Whirlpool.

77. Unless the Whirlpool Tooling is immediately returned, Whirlpool will suffer irreparable harm.

78. Whirlpool is entitled to specific performance of Core's contractual obligations, including the immediate return of the Whirlpool Tooling.

## COUNT VI
## CONVERSION

79. Whirlpool incorporates by reference the allegations in all previous paragraphs.

80. Whirlpool has the present right of possession of the Whirlpool Tooling.

81. Core has wrongfully retained the Whirlpool Tooling despite Whirlpool's requests for Core to promptly return it.

82. Whirlpool has been deprived of its use of the Whirlpool Tooling.

83. Whirlpool has demanded that Core return the Whirlpool Tooling to Whirlpool, but Core has refused to do so.

84. Core has wrongfully converted the Whirlpool Tooling.

85. Whirlpool has suffered damages arising out of Core's conversion of the Whirlpool Tooling in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Whirlpool requests that the Court enter an order and judgment in favor of Whirlpool and against Core:

(a) ordering Core to immediately and without delay account for and deliver possession, custody and control of the Whirlpool Tooling to Whirlpool;

(b) ordering Core to allow Whirlpool and/or its authorized representatives immediate, full and continuous access to Core's facilities to inspect, inventory, account for, load, remove and transport the Whirlpool Tooling;

(c) ordering Core to take all necessary and reasonable steps to preserve and protect the Whirlpool Tooling until such time as the Whirlpool Tooling is safely and in orderly fashion inspected, accounted for, loaded and removed from Core's facilities;

(d) ordering Core to provide all reasonable and necessary assistance to Whirlpool in its efforts to take possession of the Whirlpool Tooling;

(e) awarding damages in favor of Whirlpool in an amount to be determined at trial;

(f) awarding Whirlpool its attorney fees, costs and expenses; and

(g) awarding Whirlpool such other and further relief as this Court may deem just or proper or to which Whirlpool may be entitled.

>Respectfully submitted,
>
>/s/ Steven S. Kaufman
>Steven S. Kaufman (0016662)
>*Steven.Kaufman@Kaufman-Company.com*
>Jennifer A. Lesny Fleming (0062083)
>*Jennifer.Fleming@Kaufman-Company.com*
>Lorraine Evelyn Gaulding
>*Lorraine.Gaulding@Kaufman-Company.com*
>KAUFMAN & COMPANY, LLC
>1001 Lakeside Avenue – Suite 1710
>Cleveland, Ohio 44114
>PH: 216.912.5500
>FX: 216.912.5501
>
>*Attorneys for Plaintiff Whirlpool Corporation*